CHARLES L. SMITH v. ST. PAUL & DULUTH RAILROAD COMPANY.[1]

February 25, 1895.

No. 9058.

**Cause of Action for Injuries—Release—Consideration.**

Where an employé, in consideration of an agreement on the part of the employer to give him work as long as he is able to perform it, releases a claim for damages said to have been caused by the employer's negligence, the agreement is not void because lacking mutuality. By releasing his claim the employé has paid in advance for an optional contract, and he has the right to have it remain optional.

**Railway Engineer—Discharge for Intoxication.**

Any conduct on the part of a railway engineer, in respect to the use of intoxicating liquors, which, to retain him, would render it negligence on the part of a railway company towards its passengers, constitutes good and sufficient ground for the engineer's discharge.

**Verdict not Sustained.**

*Held,* that the verdict in the case was not sustained by the evidence.

Action in the district court for Ramsey county for damages because of failure of defendant to carry out the agreement mentioned in the opinion. At the trial, defendant contended that the terms

[1] Reported in 62 N. W. 392.

of any such agreement were contained in a letter from its general manager to the master mechanic of the road, instructing the latter to employ plaintiff as long as his services were satisfactory. Plaintiff maintained that, in return for the release mentioned in the opinion, he was to be employed as long as he was able to do the work. The court refused defendant's request to charge the jury that if they found defendant merely gave plaintiff the option to keep his old position as engineer as long as he was able to do the work, and plaintiff did not agree to work for defendant as long as he was able, then they must find for defendant. The court charged the jury that, if defendant promised to give plaintiff employment as an engineer as long as he was able to perform the duties of the position, and afterwards, without reasonable cause, discharged him, the latter being mentally and physically sound, then such discharge amounted to breach of contract, and defendant was liable in damages. The court directed a verdict for defendant in case the jury found plaintiff was properly discharged, and, instructing the jury as to the duty of defendant to the traveling public in the management of its trains, charged the jury that, if they found plaintiff became addicted to the frequent or excessive use of intoxicating liquors, defendant had a right to discharge him. The jury returned a special verdict that the agreement was upon the terms claimed by plaintiff; that plaintiff was not addicted to the excessive use of intoxicating liquors, and that he was a safe man for the defendant to employ as engineer upon its passenger trains; and in a general verdict for the plaintiff they assessed his damages at $4,200. From an order, Otis, J., denying defendant's motion to set aside the verdict and for a new trial, defendant appealed.

Appellant's sixth assignment of error was the refusal of the court to charge that, if the jury found plaintiff was entitled to recover, in assessing damages they could only consider damages shown to have been suffered from the date of his discharge up to the time of trial. Its seventh assignment of error was the refusal of the court to charge that prospective damages—loss which plaintiff might suffer in future—were so indefinite and uncertain that they could not form the basis of a verdict for damages. Reversed.

*J. D. Armstrong* and *Bunn & Hadley,* for appellant.

*Francis H. Clarke* and *M. F. Propping,* for respondent.

COLLINS, J.   In September, 1889, while in defendant's employ as a locomotive engineer, the plaintiff, claiming that he had been injured by means of a defective reverse lever on his engine, brought an action for damages, alleging defendant's negligence.   In consideration of a full release of all claims arising out of the injuries, the latter agreed to give to the former his old position on the road, and to retain him as long as he should be able to do the work.   The plaintiff thereupon resumed work, and by virtue of certain rules relating to duration and period of service, through which came seniority in point of time of employment, he was entitled to, and up to September 21, 1892, did, run a passenger locomotive between St. Paul and Duluth.   He was then discharged, the reason given being that he was addicted to the frequent and excessive use of intoxicating liquors.   Two questions only need to be discussed,—the first touching upon defendant's contention that, allowing the plaintiff the benefit of the most favorable interpretation of the testimony, no valid and subsisting contract was established; and the second relating to the claim that, from the evidence, it clearly and conclusively appeared that defendant company had good cause for discharging the plaintiff from its employ.

1. There can be no sufficient objection to the contract as proven, on the ground that it lacks mutuality, because the plaintiff was not bound, by its terms, to continue in defendant's service but could cease work at his pleasure.   The consideration for defendant's agreement to employ was paid by the release of plaintiff's claim for damages quite as much and as effectually as if plaintiff had actually paid cash.   By releasing his claim for damages, the plaintiff paid in advance for the privilege or option of working for the defendant; and, having done this, he had the right to have it remain optional with him how long he would continue to work for the company, while it remained obligatory upon the latter to furnish the opportunity so long as he chose to work, and was able to properly perform the same.   The plaintiff had parted with value for the optional contract, and there was owing to him a reciprocal duty and obligation on the part of the company.   Pennsylvania Co. v. Dolan, 6 Ind. App. 109, 32 N. E. 802.

2. The trial judge, when denying defendant's motion for a new trial, frankly stated that he would have been better satisfied if the

jury had found that the defendant had good cause for discharging the plaintiff from its service. We are not surprised at this expression of dissatisfaction, for we regard the evidence as conclusive upon this branch of the defense; and, although it is with great reluctance that we interfere with the determination of a question of fact by a jury, there are cases where justice imperatively demands that it be done. This is such a case. The testimony was overwhelming that for more than two years before his dismissal the plaintiff had been in the habit of visiting saloons, usually when off duty, and drinking until he became partially or wholly intoxicated. The fact was shown by saloon and bar keepers, and by men who kept boarding houses at which the plaintiff had boarded. This class of testimony was rebutted simply by the evidence of plaintiff's acquaintances to the effect that they had never seen him under the influence of liquor, and by his own denials that he was drunk, or visibly affected by liquor, at any time or place. The real value of plaintiff's denials may best be determined by a statement that in his opinion, as shown by a cross-examination, there is in respect to a man's ability to transact business a marked difference between one who is simply under the influence of liquor and one who is intoxicated. This may be true to an extent, but when we discover that the plaintiff's opinion is that a person may be in a "staggering" condition, and still not be intoxicated; that it "is all owing to what extent he staggers"; and, further, that he thinks a man is not intoxicated until he has drunk so that "he don't know what he is doing,"—we are driven to the conclusion that his denials should have had little weight with the jury. The testimony of his acquaintances was merely negative, and, as against the positive statements of the many witnesses before mentioned, was not entitled to very much consideration. But this is not all. It was shown by engineers and firemen employed by defendant and by other railways, and by some not in the employ of any road at the time of the trial, that plaintiff was addicted to the use of liquor to such an extent that he was oftentimes noticeably affected by it, generally when off duty, but occasionally when running his engine. In the year 1891 he was suspended by defendant's general manager for alleged drunkenness. At this particular time he was temporarily handling a switch engine, and the undisputed testimony was that early in the afternoon

this engine was so managed that two accidents occurred; that the switching crew then refused to work with him longer; that the fireman took charge of the engine while he retired to a caboose and went to sleep. The suspension was for 30 days, and although plaintiff, at the time, insisted that it was without good reason, he did not treat the matter as a man careful of his reputation, and ready and able to meet and resent so serious a charge, would have done. From the time he resumed work down to the day of his final discharge, the officials of defendant were obliged, on several occasions, to caution him as to his habits. Coming to the occurrence which led to his dismissal, the testimony was that he came to his engine at Duluth, in the morning (a passenger run to St. Paul), very much under the influence of liquor; that he fell asleep while on his seat in the cab, before leaving the depot; that he was drowsy on the way to St. Paul; and that, while waiting at Rush City for a delayed train, he again went to sleep in the cab. Two weeks after his discharge, he took the so-called "gold cure" for drunkenness. With this evidence introduced by defendant, let us examine plaintiff's own testimony. He admitted that for more than two years prior to the dismissal he had been in the habit of frequenting saloons, and drinking more or less,—never to excess, however; that while on duty with the switch engine, and just before the accident mentioned, he drank several glasses of beer in a saloon, then left the engine, and for two hours was asleep in the caboose. He also admitted that before breakfast, on the day he made the final run from Duluth to St. Paul, feeling the need of a "bracer," as he called it, he went to a saloon, and there drank port wine and whisky; that he was drowsy while on the road, and perhaps asleep. He also acknowledged that he got drunk soon after his dismissal. When questioned as to his reason for taking the gold cure, he stated that he took it to dispel any taste or desire for liquor, and to satisfy the defendant's officers, so that they would reinstate him, but that he had no need for the treatment at all. It was shown that at a former trial he gave no such reason, but stated positively that he took the cure solely because he felt blue about his dismissal; that he had sickness and death in his family; that he drank some, and feared that he might get in the habit of drinking to excess, so he thought he would take treatment, and stop it. These explanations were so utterly different and inconsistent,

and the one given at the trial, now under consideration, so weak and unreasonable, that we do not think it worthy of very serious consideration. It is well known that men do not acquire the drink habit in a few days, nor are they apt to anticipate and ward off its acquisition by taking the cure. Applying a practical test to the undisputed evidence respecting the plaintiff's habits during the last two years he was in defendant's employ, let us ask what would be thought of a railway company which, with knowledge of the facts, kept such a man in its employ as an engineer of a passenger locomotive,—or any locomotive, for that matter. Suppose an accident should occur, alleged to be attributable to his bad habits. Any court or jury, without a moment's hesitation, would pronounce the company grossly negligent in retaining such a servant. While, according to the technical distinctions of the books, plaintiff was only bound to use reasonable or ordinary care in the discharge of his duties, although the railway company was bound to exercise the highest degree of care towards its passengers, yet the degree of care on plaintiff's part must have been relative to the nature of his duties, and to the degree of responsibility which devolved on his employer. The degree of care incumbent on plaintiff while driving an engine is evident. If there is any employment which requires a clear head, steady nerves, and cool judgment, it is that of a locomotive engineer on a passenger train. Carriers of passengers by rail, with knowledge that an engineer's habits are such that he is liable to get drunk and wreck a train, are not obliged to, and must not, wait until the catastrophe actually occurs. It is their duty to promptly discharge such a man. We feel justified in stating, as a proposition of law, that any conduct on the part of an engineer, in respect to the use of intoxicating liquors, which, to retain him, would render it negligence on the part of a railway company towards its passengers, constitutes good and sufficient grounds for the engineer's discharge. In view of the undisputed evidence as to plaintiff's habits, the verdict cannot stand.

3. The questions raised by defendant's sixth and seventh assignments of error are covered by the case of McMullan v. Dickinson Co., supra, p. 156, 62 N. W. 120.

Order reversed.